

FILED

MAY 2 9 2020

Clerk, U.S. District Court
District Of Montana
Missoula

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

WILLIAM VASQUEZ,

             Plaintiff,

    vs.

BNSF RAILWAY COMPANY, a
Delaware corporation,

             Defendant.

CV 18–164–M–DLC


ORDER


Before the Court are: (1) Defendant BNSF Railway Company's Motion for

Summary Judgment (Doc. 32); (2) Plaintiff William Vasquez's First Motion to

Compel Discovery (Doc. 37); (3) BNSF's Motion for Protective Order (Doc. 39);

(4) BNSF's Motion in Limine (Doc. 63); (5) BNSF's Motion to Exclude Expert

Testimony (Doc. 65); (6) Vasquez's Motion in Limine (Doc. 67); and (7)

Vasquez's Motion for Telephone Conference (Doc. 83). Because the Court grants

summary judgment in favor of BNSF, the remainder of the motions will be denied

as moot.

Vasquez filed this lawsuit on September 19, 2018, alleging that the

termination of his employment was unlawful under the Federal Railroad Safety Act

("FRSA"). He claims that he was not terminated for violating BNSF's policies but

rather because he made reports of hazardous safety conditions regarding: (1) crew fatigue; (2) BNSF's refusal to engage Positive Train Control ("PTC") on a train he was operating as engineer; and (3) training procedures.  The Court concludes that Vasquez did not, in fact, make any safety-related reports and that, even if he did, any such report was not a contributing factor in BNSF's decision to terminate Vasquez's employment.

Thus, there is "no genuine dispute as to any material fact[,] and [BNSF] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court grants BNSF's motion for summary judgment.

## BACKGROUND[1]

Vasquez began work as an engineer for BNSF in 1995 in Whitefish, Montana.  (Doc. 61 at 1–2.)  His employment was terminated in early 2017.  Because he has since been reinstated, damages are limited to the period of time between January 2017 and November 2019, during which he was not employed by BNSF.

In the summer of 2016, Vasquez signed a "low performance waiver," "acknowledg[ing] acceptance" of "Level S" (for "serious") discipline, which

---

[1] To the degree that the facts are disputed, they are construed in favor of Vasquez, the nonmoving party. *Rollins v. Community Hosp. of San Bernardino*, 839 F.3d 1181, 1185 (9th Cir. 2015).  That said, where the facts are not themselves disputed but rather how the facts should be interpreted, the Court draws only "*reasonable* inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (emphasis added).

included a 30-day suspension and a three-year probation period.  (Docs. 33-7, 61 at 4.)  Although the basis for this disciplinary action is not particularly relevant, it appears that Vasquez was disciplined for logging low hours.  (Doc. 33-7.)  Despite the imposition of a probationary period, Vasquez's supervisor, James Pino apparently suggested that Vasquez would not be terminated even if he were to commit a serious offense after signing the waiver, including if he went through an absolute red signal, which requires the train to be stopped before reaching the signal.  (Doc. 61 at 5, 15, 19.)

Vasquez reported for work in the early morning hours of November 28, 2016 in Hauser, Idaho.  (Doc. 61 at 8.)  Working alongside conductor Doug Malley, Vasquez noted that their train should travel no faster than 45 miles per hour due to its cargo load.  (Doc. 61 at 8–9.)  However, the train's Positive Train Control ("PTC")—a system that limits train speed—was set to 55 miles per hour. (Doc. 61 at 8–9.)  Resetting PTC required coordination with dispatch, and Malley—who, as conductor, was charged with communicating with the dispatcher—indicated that he and Vasquez were having trouble setting the system up.  (Doc. 61 at 9–12.)  The dispatcher instructed Malley that they could leave without engaging PTC.  (Doc. 61 at 11–13.)  Although Malley apparently agreed initially, Vasquez was concerned, and he and Malley attempted to reengage

dispatch several times without success.  (Doc. 61 at 10–11.)  The train left the

Hauser yard without PTC engaged at 5:25 a.m.  (Doc. 61 at 10.)

As the train approached West Libby, Montana early in the afternoon of

November 28, Malley informed Vasquez of a yellow signal, which Vasquez knew

to mean that the train should be slowed to 30 miles per hour and that a red signal

may be approaching.  (Doc. 61 at 13–14.)  Indeed, BNSF asserts that there was a

red signal down the track at the East Libby switch.[2]  (Doc. 61 at 14.)  The train

passed that signal and continued to travel approximately 2,030 feet before coming

to a complete stop at the Libby Depot.  (Doc. 61 at 15.)  The failure to stop before

the red signal, described as a "red block incident," triggered an investigation into

Vasquez and Malley, as well as Vasquez's automatic decertification as an engineer

by the Federal Railroad Administration.  (Docs. 33-19, 61.)

During the investigation, Vasquez stated that the red block incident would

not have occurred if either (1) PTC had been engaged, as PTC "would have warned

[him] that that signal was coming" or (2) he had been working with "an

experienced, qualified conductor," who "would have said something . . . like, red

block, red block, you know, or he would have dumped it, or you know, there

---

[2] Vasquez disputes that there was, in fact, a red signal.  (Doc. 61 at 15.)  However, even
assuming that the factual dispute is genuine, it is nonmaterial, as there is no evidence to suggest
that BNSF did not believe the signal to be red.  As discussed below, BNSF was unaware of any
of Vasquez's alleged protected activities until *after* initiating an investigation into the red block
incident, so the actual color of the signal does not influence the Court's analysis of retaliation.

would have been something there that would have happened." (Doc. 61 at 16–17.)

Vasquez went on to say:

> The problem is we're getting so many new guys out here, that I'm familiar with the territory and don't have, I'm basically up there, not only me, other Engineers and the way they've got these pools running, people are running this way, going to Spokane and back, they haven't even been there that much, and basically, I'm having to train them as I'm doing my own job, so I'm doing multiple, multiple things up there, but what, guys that aren't qualified or . . . experienced.

(Doc. 61 at 17.)

Based in part on Vasquez's previous conversation with Pino regarding the effect of his earlier Level S discipline, BNSF offered to Vasquez a waiver, which his union had previously requested. (Doc. 61 at 19–20.) Vasquez testified at his deposition that he understood he would not be terminated if he signed the waiver, but he nonetheless refused to do so. (Doc. 61 at 20–21.) He was terminated on January 27, 2017 for his second Level S violation. (Doc. 61 at 21.) He has since been reinstated as an engineer pursuant to a decision by the Public Law Board, which found that the record supported disciplinary action but that discipline less than termination was appropriate. (Docs. 30-30, 61 at 24.) Vasquez was reinstated on November 19, 2019 without pay for his time out of service. (Doc. 61 at 24.)

Vasquez brought this suit alleging retaliation under the FRSA, which protects railroad employees from adverse employment actions triggered by the employees' good faith reports of hazardous safety conditions. Relevant here, he

claims that his termination was not due to the imposition of a second Level S

discipline but rather due to his reports of three safety-related conditions: (1) crew

fatigue; (2) lack of PTC on the train involved in the red block incident on

November 28, 2016; and (3) failure to adequately train conductors.  Additional

facts are discussed as relevant to the Court's analysis below.

## LEGAL STANDARD

### I.    Summary Judgment

A court must grant summary judgment if the moving party "shows that there

is no genuine dispute as to any material fact and [it] is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "The inquiry performed is the threshold

inquiry of determining whether there is the need for a trial—whether, in other

words, there are any genuine factual issues that properly can be resolved only by a

finder of fact because they may reasonably be resolved in favor of either party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[I]f reasonable minds

could differ as to the import of the evidence," summary judgment must be denied.

*Id.* at 250–51.

### II.    The FRSA

The FRSA provides that a railroad carrier may not "discharge, demote,

suspend, reprimand, or in any other way discriminate against an employee for

reporting, in good faith, a hazardous safety or security condition."  49 U.S.C.

§ 20109(b)(A). "A claim for unlawful retaliation under the FRSA has two stages:

the prima facie stage, *see* 49 U.S.C. § 42121(b)(2)(B)(i)–(iii)[3]; 29 C.F.R.

§ 1982.104(e), and the substantive stage, *see* 49 U.S.C. § 42121(b)(2)(B)(iii)–(iv);

29 C.F.R. § 1982.109(a)–(b)." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th

Cir. 2018).  Each stage requires application of a burden-shifting framework.

First, the employee must establish a prima facie case for retaliation by

alleging the existence of four elements:

> (i) The employee engaged in a protected activity (or . . . was perceived
> to have engaged or to be about to engage in protected activity);
>
> (ii) The respondent knew or suspected that the employee engaged in the
> protected activity (or . . . perceived the employee to have engaged or to
> be about to engage in protected activity);
>
> (iii) The employee suffered an adverse action; and
>
> (iv) The circumstances were sufficient to raise the inference that the
> protected activity (or perception thereof) was a contributing factor in
> the adverse action.

29 C.F.R. § 1982.104.  If the employee meets his or her burden, the employer can

defeat the employee's prima facie case by "demonstrat[ing], by clear and

convincing evidence, that the employer would have taken the same unfavorable

personnel action in the absence of [the protected activity]."  49 U.S.C.

§ 42121(b)(2)(B)(ii).

---

[3] The FRSA, 49 U.S.C. § 20109, expressly incorporates the standards set forth in § 42121, which would otherwise appear to apply only to the aviation industry.  49 U.S.C. § 20109(d)(2).

Second, "[a]t the substantive stage, a violation will be found 'only if the complainant demonstrates that any [protected activity] *was* a contributing factor in the unfavorable personnel action alleged in the complaint." *Rookaird*, 908 F.3d at 460 (quoting 49 U.S.C. § 42121(b)(2)(B)(iii)) (emphasis and alteration in original). "Then—like at the prima facie stage—the employer can defeat the retaliation claim 'if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]." *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)) (alteration in original).

## DISCUSSION

Vasquez alleges that BNSF terminated him in retaliation for three good faith reports of hazardous safety conditions. First, he claims that he was terminated because he alleged conditions causing fatigue among crewmembers. Second, he contends that his termination was triggered by his complaints about BNSF's failure to implement PTC on the train involved in the red block incident. And third, he argues that BNSF wrongfully terminated him for making complaints of unsafe working conditions related to BNSF's failure to ensure that conductors were qualified and adequately trained.

BNSF requests summary judgment as to all three reports, which the Court grants. First, even if Vasquez had reported that BNSF's scheduling practices

caused fatigue—and he did not—he failed to exhaust administrative remedies regarding this claim. Second, Vasquez did not report an unsafe condition arising from the failure to implement PTC on the train when he and Malley attempted to engage dispatch without success. Finally, Vasquez did not report a hazardous safety condition when he suggested during the investigation into the red block incident that a more experienced conductor would have made him aware of the red signal and that he was struggling to perform his own duties while training his conductor.

Before the Court weighs in on the merits, though, it addresses Vasquez's threshold procedural argument against summary judgment—that BNSF did not authenticate or establish foundation for documents used to support its statement of facts. This argument, too, cannot defeat summary judgment, as BNSF's submission is adequate.

## I.   Procedural Defects

Vasquez argues that the Court "should deny BNSF's motion for summary judgment in its entirety" on the grounds that BNSF failed to offer declarations or affidavits establishing foundation for supporting exhibits. (Doc. 60 at 8.) The Court disagrees with Vasquez's procedural argument. Not only does the Court disfavor deciding substantive issues on the basis of a technicality, but Vasquez's position is foreclosed by prior Court order.

As discussed during the preliminary pretrial statement and outlined in the Court's Scheduling Order of February 4, 2019, "the parties stipulate to the foundation and authenticity of all discovery items produced in pre-trial disclosure and during the course of discovery." (Doc. 18 at 5.)  A party may object to foundation or authenticity by "mak[ing] a specific objection to opposing counsel, in writing, prior to the deadline for the close of discovery." (Doc. 18 at 5.)  This rule is consistent with Federal Rule of Civil Procedure 16(c)(2)(C), designed to "avoid unnecessary proof" and prevent unreasonably prolonging trial.

Here, there is no legitimate dispute regarding the authenticity or foundation of any documents supporting BNSF's motion.  Indeed, Vasquez has not identified any specific documents he contends the Court should not consider.  Because the documents supporting the motion were produced in discovery, and neither party has meaningfully questioned foundation or admissibility, they would be admissible at trial.  (Doc. 18 at 5.)  The Court will not deny BNSF's motion for summary judgment on this basis.

## II.   Fatigue

Vasquez claims to have been terminated for making safety complaints regarding crew fatigue.  In the fall of 2016, Vasquez submitted several "wage claim forms" after being called into work early.  (Docs. 33-10 through 33-15.)  These forms are the means by which BNSF crewmembers request reclassification

of their hours in order to increase their pay.  (Doc. 61 at 7–8.)  In his comments,

Vasquez's strongest complaint was that BNSF did "not manage the pool properly"

and "back to backed W[hite]fish crew out of W[hite]fish to protect Havre jobs."

(Docs. 33-10, 33-12.)  Vasquez did not claim to have been fatigued on these trips,

and he did not state that BNSF's alleged mismanagement of scheduling caused an

unsafe condition.

In his Complaint (Doc. 1), Vasquez did not allege that he was terminated for

reports regarding crew fatigue.  Nor did he make such an allegation to the

Occupational Safety and Health Administration ("OSHA") in the mandatory

administrative proceeding.  29 U.S.C. § 20109(d)(1) ("A plaintiff "initiate[s]" a

FRSA claim by "filing a complaint with the Secretary of Labor.").  Indeed, the

basis for this claim appears to have arisen nearly a year after Vasquez filed this

lawsuit, during his July 24, 2019 deposition, when he gave his attorney the wage

claim forms, which he retrieved from a box in his truck.  (Doc. 61 at 8; *see also*

Doc. 60 at 10–12.)

BNSF argues that it is entitled to summary judgment regarding Vasquez's

fatigue-related complaints because: (1) Vasquez failed to exhaust administrative

remedies; (2) the decisionmakers who terminated Vasquez's employment were not

aware of the existence of the complaints; (3) Vasquez did not, in fact, engage in a

protected activity; and (4) Vasquez's allegedly protected activities did not

contribute to BNSF's decision to terminate his employment.  The Court concludes

that BNSF is entitled to summary judgment under theories (1) and (3), either of

which would be independently sufficient.  Thus, it does not reach the two

remaining theories.

### A. Failure to Exhaust

Given that the parties were unaware of the basis for Vasquez's claim

regarding crew fatigue prior to July of 2019, there can be no dispute that Vasquez's

fatigue-related FRSA claim was not presented to OSHA.  The question that

remains is legal: Must Vasquez first exhaust administrative remedies as to every

alleged protected activity prior to bringing a FRSA action in federal court?  The

Court does not decide that, as a matter of law, a plaintiff can never raise a new

theory of retaliation in a FRSA action.  However, under the circumstances of the

present case, the Court concludes that Vasquez's failure to bring his safety-related

claim to OSHA bars its consideration now.

Administrative exhaustion requirements do not exist as mere procedural

hurdles; they serve important policy goals.  In the context of the FRSA, the

administrative exhaustion requirement exists to "afford OSHA the opportunity to

resolve the plaintiff's allegations through the administrative process." *Rookaird v.

BNSF Ry. Co.*, No. C14-176RSL, 2015 WL 6626069 (W.D. Wash. Oct. 29, 2015)

(quoting *Bozeman v. Per-Se Technologies, Inc.*, 456 F. Supp. 2d 1282, 1358 (N.D.

Ga. 2006)), *rev'd in part on other grounds by Rookaird v. BNSF Ry. Co.*, 908 F.3d 451 (9th Cir. 2018). "[S]ince agency decisions are frequently of discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." *McKart v. United States*, 395 U.S. 185, 194 (1969). In other words, OSHA's toolbox is at once more diverse and more narrowly tailored than the Court's. If OSHA were to find a violation, it could find a solution beyond awarding wrongful termination damages, which could improve BNSF's safety policies affecting its entire workforce, better satisfying the FRSA's goal of improving rail safety.

This is not to say that a federal court can never consider evidence or theories that were not presented before the administrative agency. "In the analogous context of a Title VII action, a plaintiff who complains of more than one discriminatory or retaliatory act must timely exhaust administrative remedies as to each." *Frost v. BNSF Ry. Co.*, 218 F. Supp. 3d 1122, 1129–30 (D. Mont. 2016) (quotation omitted). "However, for retaliation claims based on the filing of a complaint[,] administrative exhaustion is not required and subject matter jurisdiction before the district court exists where the retaliation claim is reasonably related to the administrative complaint." *Id.* at 1130 (quotation and ellipses omitted).

But this is not an instance where the plaintiff's failure involves only "additional claims that are 'so closely related [to the allegations made in the charge] that agency action would be redundant.'" *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1102 (9th Cir. 2002) (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1457 n.2 (9th Cir. 1990)). Nor does it bear any similarity to *Frost*, in which the plaintiff's new theory arose from the filing of the OSHA complaint itself. 218 F. Supp. 3d at 1130. Vasquez's claim alleging wrongful termination on the basis of his fatigue-related complaints is completely independent of his other claims; that is, he could succeed under any one theory, and it would not increase or decrease the likelihood of success under any other. Neither OSHA nor BNSF was "placed on notice that it was required to investigate" BNSF's alleged retaliation for Vasquez's safety complaint. *Windom v. Norfolk S. Ry. Co.*, No. 5:12-cv-345 (MTT), 2013 WL 432573, at *3 (M.D. Ga. Feb. 1, 2013) (quoting *Bozeman*, 456 F. Supp. 2d at 1358) (rejecting argument that OSHA was not made sufficiently aware of claims against defendant named in the heading of the administrative complaint but not otherwise mentioned).

Vasquez was required to exhaust administrative remedies as to each allegedly retaliatory act. Because he did not do so as to the claim that BNSF retaliated against him for complaining of crew fatigue, he cannot proceed with this claim in this Court. BNSF is entitled to summary judgment on Vasquez's claim

that he was terminated in violation of FRSA for reporting conditions causing
fatigue.

## B. Protected Activity

Although the failure to exhaust administrative remedies is dispositive, the
Court nonetheless determines that summary judgment is appropriate for an
independent, equally significant reason—Vasquez did not "report[], in good faith,
a hazardous safety . . . condition" when he submitted wage claim forms requesting
higher pay.  49 U.S.C. § 20109(b)(A).

As a threshold matter, the Court rejects BNSF's theory that the FRSA is
indifferent to complaints regarding crew fatigue.  As addressed at length in this
Court's recent decision in *Jones v. BNSF Railway Co.*, federal law does not
preclude Vasquez's retaliation claim when the other statutory schemes governing
fatigue among rail workers, the Hours of Service Act and the Federal Rail Safety
Improvement Act, complement rather than override the FRSA.  *Jones v. BNSF Ry.
Co.*, CV 18-146-M-DLC, 2020 WL 2062180, at *6 (D. Mont. April 29, 2020).
Additionally, a request for a change in BNSF scheduling policy due to crew fatigue
could give rise to a viable claim under the FRSA.  *Id.* at *6–7.

Here, however, there was no such request.  Unlike the plaintiff in Jones,
Vasquez did not submit a form dedicated to alleging safety issues.  He submitted

wage claim forms, requesting additional pay consistent with the existing collective bargaining agreement. While he did claim to have been called into service early and out of rotation, he never claimed to have been fatigued nor did he raise any safety concerns. No reasonable factfinder could conclude that Vasquez reported a hazardous safety condition when he asked for additional pay and neither requested a change in BNSF policy to protect safety nor suggested that he or any other crewmember had been fatigued.

Although the briefing on this point is less clear, Vasquez appears to also allege that he was terminated in retaliation for submitting to his union a "fatigue monitor" in November 2015. The Court considered a similar claim in *Jones*, noting that fatigue monitors are common forms submitted not to BNSF but to the union, which uses them to report to the Federal Railroad Administration and in negotiations with BNSF. 2020 WL 2062180, at \*2. To the degree that Vasquez's claim is premised on the November 2015 fatigue monitor, it fails due to lack of administrative exhaustion and because there is a lack of factual support that the decisionmakers were aware of Vasquez's submission of a fatigue monitor, let alone that it was a "contributing factor" in the decision to terminate Vasquez. *Rookaird*, 908 F.3d at 460; *see, e.g.*, *Dafoe v. BNSF Ry Co.*, 164 F. Supp. 3d 1101, 1114 (D. Minn. 2016) (rejecting claim when the plaintiff "point[ed] to nothing suggesting . . . that [decisionmaker's] decision was motivated by [plaintiff's]

protected activity"). Simply put, "the circumstances [are not] sufficient to raise the inference that the protected activity (or perception thereof) was a contributing factor in the adverse action." 29 C.F.R. § 1982.104.

### III.   PTC

Vasquez next claims that he was terminated in retaliation for a complaint regarding PTC on the train he was operating. However, Vasquez never made a complaint. He merely attempted to reset the PTC on his train. The only conversation that occurred regarding PTC was one in which the dispatcher, responding to Malley's statement that they were having trouble engaging PTC, stated: "Okay to cut out PTC." (Doc. 61-26 at 1.). Malley replied, "All right. Copy that okay to cut out PTC. Over." (Doc. 61-26 at 1.) Through conductor Malley, Vasquez unsuccessfully attempted to contact dispatch four or five times in order to engage PTC after this conversation ended. (Doc. 61 at 10–11.) But the attempt to contact dispatch cannot conceivably be understood as a safety complaint.

Vasquez has failed to establish a prima facie case for retaliation regarding PTC because he has not alleged that he "engaged in a protected activity." 29 C.F.R. § 1982.104(e)(2)(i). Even if Vasquez had asked dispatch to initiate PTC (and the undisputed facts establish that he did not), an employee does not "report[],

in good faith, a hazardous safety or security condition" by merely requesting that a safety feature be engaged.  49 U.S.C. § 42121(b)(1)(A).

Although BNSF is entitled to summary judgment on this claim given the absence of a complaint, the Court notes that it disagrees with BNSF's understanding of the law on a related but non-dispositive point.  BNSF argues that Vasquez's complaint regarding PTC made in November 2016 necessarily fails under the FRSA because BNSF was not required to have PTC activated on the train at that time.  (Doc. 34 at 21.)

It is true that federal law did not yet impose such a requirement.  49 U.S.C. § 20157(a) (requiring railroads to "submit to the Secretary of Transportation a revised plan for implementing a [PTC] system by December 31, 2018" on certain lines).  And it is likewise true that Vasquez testified during his deposition that he was able to safely operate trains before PTC became available.  (Doc. 33-3 at 10.)  However, as the Court recently discussed at length in *Jones*, a FRSA claim does not, as a matter of law, fail whenever the complained-of activity is consistent with federal law.  2020 WL 2062180, at *6.  Where an employee requests, in good faith, a change in railroad policies to improve safety, that employee is entitled to protection under the FRSA.  49 U.S.C. § 20109(b)(1)(A).

## IV.   Training

Finally, Vasquez contends that he was terminated in retaliation for comments made during the investigation of the red block incident—specifically, for his statement that conductors had not been adequately trained and that he accordingly had "to train them as [he was] doing [his] own job."  (Doc. 61 at 17.) In the context of the investigation, it is clear that this comment was intended as an explanation for why Vasquez's train went past the red signal.  He was not requesting that BNSF change its policies to improve safety but instead suggesting that his workload prevented him from adequately performing his job.  He did not "report[], in good faith, a hazardous safety or security condition."  49 U.S.C. § 20109(b)(1)(A).  Like Vasquez's claim regarding PTC, he cannot establish a prima facie case arising from his statements regarding conductor experience because he did not "engage[] in a protected activity."  29 C.F.R. § 1982.104(e)(2)(i).

Moreover, even if Vasquez's off-the-cuff statement about conductor inexperience were entitled to FRSA protection, the facts cannot support a finding that "[t]he circumstances were sufficient to raise the inference that the protected activity . . . was a contributing factor in the adverse action."  29 C.F.R. § 1982.104(e)(2)(iv).  The investigation was already underway when Vasquez made self-serving statements explaining why the event triggering discipline

occurred.  Nothing suggests that these statements moved the needle one way or the other, particularly in light of BNSF's proffered waiver.

## V.    Punitive Damages

Because BNSF is entitled to summary judgment on Vasquez's substantive claims, Vasquez's claim for punitive damages necessarily fails.

IT IS ORDERED that Defendant BNSF Railway Company's Motion for Summary Judgment (Doc. 32) is GRANTED.

IT IS FURTHER ORDERED that all other pending motions are DENIED as moot.

DATED this 29th day of May, 2020.


_____
Dana L. Christensen, District Judge
United States District Court